**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

—————

No. 09-4154

—————

UNITED STATES OF AMERICA

v.

EVERT JEROME THOMPSON,
                                          Appellant

—————

Appeal from the United States District Court
for the District of New Jersey
(D.C. 3-08-CR-674-02)
District Judge: Honorable Joel A. Pisano

—————

Submitted Pursuant to Third Circuit LAR 34.1(a)
July 15, 2010

Before:   FUENTES, VANASKIE, WEIS, Circuit Judges

(Filed: September 13, 2010)

—————

OPINION OF THE COURT

—————

VANASKIE, Circuit Judge.

Appellant Evert Jerome Thompson ("Thompson") appeals a jury verdict finding him guilty of both armed robbery in violation of 18 U.S.C. §§ 2113(a) and 2113(d), as well as using and/or carrying a firearm during a crime of violence as proscribed by 18 U.S.C. § 924(c)(1)(A)(ii). Thompson claims that the District Court erred in: (1) denying a motion to suppress without holding an evidentiary hearing; (2) precluding cross-examination concerning the amount of force used to effect his arrest; (3) refusing to compel the Government to produce the report of an officer who participated in the arrest, but who did not testify; and (4) allowing a lay witness to testify concerning data generated by a global positioning system ("GPS") device. Because we find that the District Court did not err, we will affirm.

I.

As we write only for the parties, who are familiar with the facts and procedural history of the case, we will set forth only those facts necessary to our analysis. On September 9, 2008, two persons robbed a Bank of America located in Iselin, New Jersey, with a Colt .357 revolver. After fleeing the bank in a stolen black BMW, the two men abandoned the car and entered into a tan Chevrolet Astro minivan. Unbeknownst to the robbers, one of the stolen sacks of money contained a GPS tracking device. The GPS device permitted police officers to monitor the stolen money's latitude, longitude, direction, and speed.

2

Relying upon transmissions from the GPS device, Detectives Mark Zeno, Michael Ng, and Walter Bukowski of the Woodbridge Township Police Department drove in an unmarked car to an intersection where they expected to intercept the black BMW. Rather than seeing a black BMW, the detectives observed a tan Astro minivan traveling the same coordinates as those provided by the GPS system. Consequently, the detectives proceeded to follow the minivan. Sergeant Christian Ladaudio of the Woodland Township Police Department's Special Investigations Unit also responded in an unmarked black pickup truck. The minivan, realizing that it was being followed, accelerated to high speeds, triggering the detectives in the unmarked car to activate its emergency lights. A high speed chase ensued and concluded with a collision between the minivan and another vehicle.

The driver exited the damaged minivan and fled the scene on foot. Sergeant Ladaudio pursued the driver with his vehicle. When the fleeing suspect jumped a guardrail, Ladaudio took up the chase on foot. Detective Ng also pursued the suspect on foot. Sergeant Ladaudio tackled the driver, who turned out to be Thompson, and Ng assisted in putting on the handcuffs and effectuating the arrest. Meanwhile, back at the scene of the accident, the passenger in the minivan, Sharron Graham, was arrested. Inside the minivan, police officers recovered a white plastic bag containing $31,007.98 in cash – the exact amount stolen from the bank. Also, police officers found attire that was worn at the robbery, a loaded Colt .357, a Radio Shack police scanner, the car key to the BMW,

and the GPS tracking device.

After Graham pleaded guilty to the armed bank robbery, a superseding indictment was returned against Thompson, charging him with armed bank robbery and using and/or carrying a firearm during a crime of violence. Prior to trial, Thompson moved to suppress evidence gathered as a result of his arrest and search of the minivan. The motion was denied without a hearing. After a three-day jury trial, Thompson was found guilty on both counts.[1]

## II.

Thompson raises four issues on appeal, which will be addressed in turn. First, he assails the District Court's denial of the motion to suppress without an evidentiary hearing. Second, Thompson argues that the District Court impermissibly restricted the scope of his cross-examination concerning the amount of force used to effect his arrest in violation of the Sixth Amendment right of confrontation. Third, Thompson claims that the government failed to comply with the requirements of Brady v. Maryland, 373 U.S. 83 (1963), in not producing the report of a non-testifying police officer. Finally, he asserts that the District Court erred by permitting a lay witness to provide testimony concerning data generated by the GPS device.

A. Motion to Suppress

---

[1] The District Court had jurisdiction pursuant to 18 U.S.C. § 3231, and we have jurisdiction under 28 U.S.C. § 1291.

Thompson argues that his motion to suppress physical evidence on his person and in the minivan established a colorable claim for relief, thus warranting an evidentiary hearing. We review the District Court's denial of an evidentiary hearing for abuse of discretion. United States v. Howell, 231 F. 3d 615, 620 (9th Cir. 2000), cert. denied, 534 U.S. 831 (2001); United States v. Glass, 128 F.3d 1398, 1408 (10th Cir. 1997). We review the District Court's denial of a motion to suppress for clear error as to the underlying factual findings, and exercise plenary review of the District Court's application of the law to the facts. United States v. Perez, 280 F.3d 318, 336 (3d Cir. 2002).

Thompson contends that the law enforcement officers lacked probable cause to apprehend him and that the evidence seized incident to his arrest should have been suppressed. Thompson was entitled to a hearing on his suppression motion only if his moving papers demonstrated a "colorable claim" for relief. United States v. Voigt, 89 F.3d 1050, 1067 (3d Cir. 1996); United States v. Brink, 39 F.3d 419, 424 (3d Cir. 1994). "In order to be 'colorable,' a defendant's motion must consist of more than mere bald-faced allegations of misconduct." Id. (citing United States v. Sophie, 900 F.2d 1064, 1071 (7th Cir. 1990) (denial of hearing affirmed when defendant's own submissions refuted his claim), cert. denied, 498 U.S. 843 (1990)).

The motion papers established that Thompson was involved in a major motor vehicle collision and fled the scene of the accident. New Jersey law makes it a crime

equivalent to that of a felony to leave the scene of an accident involving serious bodily injury, N.J. Stat. Ann. 2C:12-1.1, and leaving the scene of an accident is the equivalent of a misdemeanor. N.J. Stat. Ann. 39:4-129. A person may be arrested without a warrant for committing either a felony or a misdemeanor in a police officer's presence in a public place. Maryland v. Pringle, 540 U.S. 366, 370 (2003). Sergeant Ladaudio clearly had probable cause to arrest Thompson for the felony of leaving the scene of an accident involving serious bodily injury, as well as the misdemeanor offense of leaving the scene of an accident. See United States v. Burton, 288 F.3d 91, 98 (3d Cir. 2002) (facts "were sufficient to warrant a prudent man in believing that the [defendant] had committed or was committing an offense") (quoting Beck v. Ohio, 379 U.S. 89, 91 (1964)). Therefore, the search of Thompson's person incident to arrest was proper.

As to the seizure of the evidence from the damaged minivan, Thompson forfeited any privacy interest in the vehicle when he fled the scene. See United States v. Allen, 235 F.3d 482, 489 (10th Cir. 2000) ("Mere presence is not sufficient to show a legitimate possessory interest or lawful control over a vehicle – particularly when the individual flees the scene after being stopped by law enforcement officers.") (emphasis added). Accordingly, because it is clear that the arrest and search did not infringe Thompson's Fourth Amendment rights, the District Court did not abuse its discretion in denying the

6

suppression motion without an evidentiary hearing.[2]

B. Sixth Amendment Right to Cross-Examination

Thompson claims that the District Court erred by granting the government's

motion in limine precluding evidence, lines of questioning, or argument concerning

alleged use of force and police brutality during the arrest. We review the District Court's

decision to admit or exclude evidence, as well as to limit cross-examination, for abuse of

discretion. United States v. Ellis, 156 F.3d 493, 498 (3d Cir. 1998), United States v.

Mathis, 264 F.3d 321, 326-27 (3d Cir. 2001). While such discretion is not unlimited,

"[o]ur scope of review is so restricted because '[t]he admission or exclusion of evidence

is a matter particularly suited to the broad discretion of the trial judge.'" United States v.

Casoni, 950 F.2d 893, 902 (3d Cir. 1991) (citation omitted).

The main purpose of the Confrontation Clause is to permit the cross-examination

of a witness. Delaware v. Van Arsdall, 475 U.S. 673, 678 (1986) (citing Davis v. Alaska,

415 U.S. 308, 315 (1974)). The Confrontation Clause, however, does not guarantee

cross-examination in whatever manner the defendant desires. See United States v. Lore,

430 U.S. 190, 208 (3d Cir. 2005) (citing Delaware v. Fensterer, 474 U.S. 15, 20 (1985)

---

[2] In any event, any error in denying the suppression motion was harmless as the evidence at trial established probable cause to arrest Thompson and Graham for the armed bank robbery and search the minivan. See Gov't of Virgin Islands v. Williams, 739 F.2d 936, 939 (3d Cir. 1984) (in considering the denial of a motion to suppress "this court may look at the entire record," and is not limited to the information presented in the suppression motion).

(per curiam)).  Instead, "a district court retains 'wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant.'" United States v. Mussare, 405 F.3d 161, 169 (3d Cir. 2005) (quoting Van Arsdall, 475 U.S. at 678-79).

Thompson has not shown how evidence of the amount of force used to apprehend him and place him in custody is relevant to the question of whether he was guilty of the charges of armed bank robbery and using and/or carrying a firearm during a crime of violence.  Nor has he articulated how evidence of alleged police brutality when he was finally apprehended would be probative of bias on the part of the law enforcement officers who testified at trial.  Stated otherwise, Thompson has failed to demonstrate that the alleged excessive force in arresting him had a "tendency to make the existence of any fact that is of consequence to the determination" of the armed robbery trial "more or less probable . . . ."  Fed. R. Evid. 401.  Accordingly, the District Court did not abuse its discretion by precluding Thompson's counsel from exploring alleged police brutality.

C. Brady Violations

Thompson asserts that the government violated Brady by failing to produce Sergeant Ladaudio's police report, as well as alleged use of force documents he

8

authored.[3]  (App't's Br. 27-9.)  Thompson claims this information was material because it would have rebutted the consciousness of guilt inference arising from his fleeing the scene of the accident by showing that he was afraid of the pursuing officers and would have shown bias on the part of the officers who may have used excessive force in bringing about his arrest.  (Id. at 31-3.)  "Because a Brady claim presents questions of law as well as questions of fact, we will conduct a de novo review of the district court's conclusions of law as well as a 'clearly erroneous' review of any findings of fact where appropriate."  United States v. Perdomo, 929 F.2d 967, 969 (3d Cir. 1991) (citation omitted).

"To establish a Brady violation, it must be shown that (1) evidence was suppressed; (2) the evidence was favorable to the defense; and (3) the evidence was material to guilt or punishment."  United States v. Risha, 445 F.3d 298, 303 (3d Cir. 2006).  There was no Brady violation in this case because the Ladaudio report was not favorable to the defense.

The withheld police report recounts Ladaudio observing a vehicle driven by the suspected bank robbers.  A pursuit ensued, with Ladaudio trailing both the minivan and the unmarked police car.  The pursuit ended with the bank robbers' vehicle crashing.  Sergeant Ladaudio proceeded to witness the driver, Thompson, exit the vehicle and flee.

_____

[3] Sergeant Ladaudio's report of the incident has been produced as part of the record on appeal and is at SA567.  There is no indication that Ladaudio prepared any other report.

9

Ladaudio drove his unmarked vehicle closer to the area where Thompson was running – a Wal-Mart parking lot. Sergeant Ladaudio exited his vehicle and pursued Thompson on foot; Thompson ignored his orders to stop running; Ladaudio restrained Thompson; and Detective Ng arrived to assist with handcuffing Thompson.

Contrary to Thompson's bald assertion, the report would not have afforded any basis for dispelling the inference of guilt from flight. The report confirms the testimony that Thompson attempted to flee when the vehicle in which Ng was riding activated its emergency lights and siren. Nor would the report have suggested bias on the part of the officers. In short, the withheld report did not offer any possible impeachment evidence, as Sergeant Ladaudio did not testify, and the report corroborated Detective Ng's testimony. Detective Ng testified that Ladaudio was in an unmarked police vehicle, and that Ladaudio followed Ng's car in pursuit of Thompson. He additionally testified that Ladaudio apprehended Thompson, and Ng assisted in the arrest. Ladaudio's report stated that he "yielded" to Detective Ng's vehicle, and that Detective Ng "assisted with handcuffing." Therefore, nothing in the Ladaudio report is exculpatory. Accordingly, Thompson has failed to demonstrate a Brady violation.

D. Lay Witness Opinion Testimony

Thompson claims that the District Court erred by permitting a lay witness, Edward Uehlinger, to deliver opinion testimony concerning the GPS tracking device, which led to his apprehension. In particular, he challenges the admission of two exhibits that Mr.

10

Uehlinger authenticated: Government Exhibit 16, a spreadsheet listing the tracking information for the GPS device during the incident in question, (SA482-92); and Government Exhibit 18, a graphical depiction of the data produced by the GPS device during the incident. (SA493.) Mr. Thompson disputes the admissibility of the exhibits and related testimony because Mr. Uehlinger had no scientific background concerning the functionality of the GPS device. "We review the District Court's evidentiary rulings, including whether opinions are admissible under Rule 701, for abuse of discretion." Donlin v. Phillips Lighting N. America, 581 F.3d 73, 80 (3d Cir. 2009).

Mr. Uehlinger, a thirteen year Senior Account Executive with 3SI Security Systems,[4] was called to testify as a lay witness. He testified that he was trained in, experienced in, and had verified the functioning of GPS devices. Uehlinger was responsible for customer service and sales for all of his clients, primarily banks and credit unions, in New York, New Jersey, and New England. His company sold the GPS device to the Bank of America branch office that Thompson robbed. Mr. Uehlinger explained that an Electronic Satellite Pursuit ("ESP") device automatically activates when it is lifted from the bank teller's drawer, thus triggering GPS tracking. A GPS system, when activated, automatically relays the latitude, longitude, speed, and directional coordinates to the appropriate local police departments. This information is recorded on a spreadsheet

---

[4] 3SI Security Systems specializes in selling devices that aid the recovery of stolen assets.

11

titled, "ESP Tracker Data," and was admitted at trial as Government Exhibit 16.  Mr. Uehlinger further testified that when the device is activated, it creates a "bread crumb trail," meaning that a dot is created on a map to depict the device's movements.  Each dot has a latitude, longitude, direction, and speed, and each dot is time stamped.  This graphical depiction of the ESP tracking data was admitted as Government Exhibit 18.  In short, Mr. Uehlinger explained how the responding police officers were able to track and apprehend Thompson using the GPS system, and that the data generated by the device was recorded on Government Exhibits 16 and 18.

The District Court did not err in permitting Uehlinger to testify as a lay witness. Lay and expert testimony are distinguishable in that "lay testimony results from a process of reasoning familiar in everyday life, while expert testimony results from a process of reasoning which can be mastered only by specialists in the field."  Fed. R. Evid. 701 Advisory Committee's Notes (2000); see also Donlin, 581 F.3d at 81 ("[L]ay testimony must 'result[ ] from a process of reasoning familiar in everyday life,' as opposed to a process 'which can be mastered only by specialists in the field.") (quoting Notes to 2000 Amendments).  Uehlinger's testimony pertaining to the GPS data involved "lay witness [testimony based on] particularized knowledge by virtue of h[is] experience, [and as such it was admissible] – even if the subject matter [was] specialized or technical – because the testimony [wa]s based upon  [Uehlinger]'s personal knowledge rather than on specialized knowledge within the scope of Rule 702."  Donlin, 581 F.3d at 81 (3d Cir. 2009) (citing

Notes to 2000 Amendments). In this regard, Mr. Uehlinger testified that he does demonstrations for prospective clients by conducting live demonstrations of the reliability of the GPS devices, thus affording him a basis for attesting to the reliability of the system. See Eichorn v. AT&T Corp., 484 F.3d 644, 649 (3d Cir. 2007) ("'Rule 701 requires that a lay opinion witness have a reasonable basis grounded either in experience or specialized knowledge for arriving at the opinion that he or she expresses. . . .'")(original emphasis). Moreover, Uehlinger's testimony was "rationally based on the perception of the witness," as mandated by Federal Rule of Evidence 701(a).[5] Fed. R. Evid. 701(a). "The expression of opinions or inferences by a lay witness is permitted because of the qualification in Rule 701(a) that the factual predicate of the testimony be within the witness's perception." Teen-Ed. Inc. v. Kimball Int'l, Inc., 620 F.2d 399, 403 (3d Cir. 1980). Because the opinions and inferences expressed by Uehlinger were based upon his perceptions, we conclude that the District Court did not abuse its discretion in allowing Uehlinger to testify concerning the operation of the GPS device.

III.

For the foregoing reasons, we will affirm the decision of the District Court.

---

[5] Additionally, as the District Court acknowledged, the GPS' "reliability is self-evident in this case[,]" (A237), and "it seems to be self-evident that the GPS device, A, worked and, B, led the police officers to the point of arrest." (A238.)

13